Filed 1/27/25

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| In re WILLIAM STEPHENSON on Habeas Corpus. | C099785<br><br>(Super. Ct. Nos. SCV0037867, WHC001813)<br><br>ORDER MODIFYING OPINION<br><br>[NO CHANGE IN JUDGMENT] |

ORIGINAL PROCEEDING. Petition for writ of habeas corpus. Petition denied. Garen J. Horst, Judge.

John L. Staley, under appointment by the Court of Appeal, for Petitioner.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Julie A. Hokans, Deputy Attorneys General, for Respondent the People.

Rob Bonta, Attorney General, Cheryl L. Feiner, Assistant Attorney General, Gregory D. Brown and Jessica C. Butterick, Deputy Attorneys General, for Respondent State Department of State Hospitals.

_____

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II, IV, and V of the Discussion.

1

THE COURT:

It is ordered that the opinion filed herein on December 23, 2024, be modified as follows:

1.  On page 16, the last sentence prior to part I of the Discussion, beginning with "The People responded to the order to show cause," is amended to add as footnote 6 the following footnote, which will require renumbering of all subsequent footnotes:

    The People responded to the order to show cause,[6] and Stephenson filed his traverse with the assistance of counsel in September 2024.

    > [6] Throughout the opinion, we attribute to "the People" arguments and contentions made by the county prosecutor's office and/or DSH, who each filed separate returns and were each represented at bench by the Attorney General of California.

This modification does not change the judgment.


FOR THE COURT:


_____/s/_____
HULL, Acting P. J.


_____/s/_____
MAURO, J.


_____/s/_____
BOULWARE EURIE, J.

2

Filed 12/23/24; certified for partial pub. 1/14/25 (order attached) (unmodified opinion)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| In re WILLIAM STEPHENSON on Habeas Corpus. | C099785<br><br>(Super. Ct. Nos.<br>C0SCV0037867,<br>WHC001813) |

In 2007, William Stephenson was civilly committed pursuant to provisions of the Sexually Violent Predator Act (SVPA) (Welf. & Inst. Code, § 6600 et seq.)[1]  In January 2022, the trial court granted his petition for conditional release into the community but he remains in the custody of the State Department of State Hospitals (DSH).  Despite diligent efforts by multiple actors, including the trial court, an appropriate conditional

_____

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

1

release program for his outpatient treatment and supervision has not been finalized, due largely to the inability to find somewhere he can live. The trial court has denied Stephenson's multiple requests for release as a transient to a motel or to an immobilized recreational vehicle, citing concerns about public safety.

In late 2023, Stephenson filed a habeas corpus petition in the trial court seeking immediate release. After that petition was denied, Stephenson filed a habeas corpus petition in this court raising the same four claims he raised below: (1) his original civil commitment proceeding was constitutionally flawed because he was compelled to testify; (2) his continued confinement after the trial court granted his petition for conditional release violates both the SVPA's scheme and due process principles; (3) his constitutional right of access to the courts is being violated because had he been conditionally released in 2022 he would now be eligible to seek a court order for *unconditional* discharge under the SVPA; and (4) law enforcement entities exceeded their authority by notifying the general public of his potential conditional release. We issued an order to show cause, and now deny the habeas petition.

BACKGROUND[2]

In 1991, Stephenson was tried for crimes he committed against two women on separate occasions. He was convicted of penetration by foreign object (Pen. Code, § 289, subd. (a)), assault with intent to commit rape (Pen. Code, § 220), and oral copulation by force or threats (Pen. Code, former § 288a, subd. (c)) against one woman; and assault with intent to commit rape (Pen. Code, § 220) against a second woman. In 2007, a prosecutor filed a petition for civil commitment, alleging Stephenson was a sexually

---

[2] We grant in part the People's request for judicial notice and take notice of this court's earlier decisions affirming Stephenson's original commitment under the SVPA (*People v. Stephenson* (Aug. 16, 2013, C063676) [nonpub. opn.]) and affirming the revocation of Stephenson's conditional release (*People v. Stephenson* (Aug. 19, 2019, C087205) [nonpub. opn.]). The request for judicial notice is otherwise denied as unnecessary.

violent predator (SVP). A jury found the allegations of the petition true, and the trial court committed him as an SVP for an indeterminate term. (*People v. Stephenson*, *supra*, C063676 [nonpub. opn.].)

Stephenson was conditionally released from Coalinga State Hospital in 2014; however, in May 2017, the state's conditional release program (CONREP) petitioned the trial court to revoke this release. At the revocation hearing, the trial court heard evidence that Stephenson violated terms of his release, including that he possessed pictures depicting sex acts with underage girls, accessed adult pornography, deleted items from his computer and his phone, possessed an unauthorized electronic device, installed software designed to mask his online activity, and accessed the Internet without permission. Given those rule violations, the executive director of CONREP testified that Stephenson was at risk to reoffend and should be returned for inpatient treatment. The trial court found Stephenson had a severe mental disorder that was not in remission, posed a danger to the community, and was at increased risk to reoffend. It revoked his conditional release and ordered him returned to Coalinga State Hospital. (*People v. Stephenson*, *supra*, C087205 [nonpub. opn].)

In January 2022, the trial court granted Stephenson's second petition for conditional release, cautioning that its ruling did "not . . . allow Mr. Stephenson to be released without a viable safe plan for him to [be] supervised in a way that ensures community protection." Almost two years later, in an October 2023 ruling denying Stephenson's habeas corpus petition, the habeas court observed that efforts to secure appropriate placement for Stephenson had been "wrought with challenges." In 2022 alone, the trial court reviewed Stephenson's case on 11 separate court dates and considered five written reports from Liberty Health, DSH's vendor responsible for facilitating Stephenson's placement, treatment, and supervision on conditional release.

3

*December 2022 Hearing*

At the beginning of a December 2022 hearing, the trial court summarized some of the efforts made to facilitate Stephenson's conditional release that year. By June, Liberty Health had looked at 279 properties in Placer County without success; in September, the trial court directed Liberty Health to search outside of Placer County and signed a community safety plan for terms of outpatient treatment; and in November, the trial court learned of a promising lead on a residence in Amador County and authorized a financial payment to hold that property. The trial court also said it expected to decide two matters at the December 2022 hearing: Stephenson's request to be released on transient status and the People's request that it find "extraordinary circumstances" justifying placement outside of Placer County.[3]

Liberty Health's assistant program director testified at the hearing, as did the regional coordinator. They explained the context within which Liberty Health had looked at 932 single-family residences for Stephenson up to that point. They explained it is inappropriate to place an SVP in a multifamily dwelling or a boarding house because supervision is so difficult in those situations. Finding a place for rent is only the first step when Liberty Health is attempting to place an SVP in the community. The next step is determining whether the location is a sufficient distance from schools and parks. Most properties available for rent are not. When a property is located at a sufficient distance, Liberty Health contacts the rental agent or homeowner to assess their willingness to

---

[3] An SVP must be conditionally released into the county where he or she lived "prior to . . . incarceration," unless the trial court finds "extraordinary circumstances require placement" in a different county and that county is given notice and an opportunity to comment. (§ 6608.5, subd. (a)(1), (2).)

accommodate an SVP on conditional release. However, few are open to the arrangement.[4]

Regarding transient release to an impermanent location, the trial court inquired whether Liberty Health considered a mobile home/recreational vehicle (RV). "[I]t just seems like we should be able to find some land available . . . to park" an RV, the trial court said. The regional coordinator disagreed: "[T]here aren't really properties that are out there where . . . somebody has a vacant lot that they would be agreeable to allowing us to park an RV on." The regional coordinator noted that hotel or motel placements typically have negative mental health impacts on SVPs, and he could recall only one individual who had successfully adapted to such a placement.

While acknowledging that transient release to a hotel or motel was a "worst-case scenario," and that release to an RV was "less than optimal," Stephenson maintained that either option was preferable to remaining "in limbo in the hospital." Stephenson's counsel argued transient release was warranted, asserting that the housing search had gone on "long enough," and Stephenson's due process right to be released outweighed the state's interest in securing "the best possible placement for him, which would be in a house."

The assistant program director, drawing on her 18 years working as a clinical psychologist in in-patient psychiatric facilities, testified that, in her professional opinion, transient releases are the "most unsuccessful." She explained that the requirement for transient SVPs to relocate every three days complicates monitoring their interactions and can sometimes heighten community resistance.

---

[4] Liberty Health was fortunate to secure a residence for Stephenson in a densely populated neighborhood in Roseville in connection with his 2014 conditional release. One reason: the landlord lived in another state, distant from the "very extreme response [of] the local population."

The trial court denied Stephenson's request to be released on transient status, explaining: "I have determined that [Stephenson] can be released on conditional release, and it's frustrating that we cannot facilitate that in a timely manner. [¶] That being said, I'm also mindful of the public safety issues that are involved. I'm concerned about the release at this time. I'm concerned for public safety. I'm concerned also for the stress and anxiety it could cause Mr. Stephenson. I'm concerned about setting him up for failure." "I am balancing his due process rights and his right to be released . . . with the efforts that have been made to secure appropriate housing for him. And in looking at what we have in the works now, there is a very possible viable alternative, so we're not talking about an indefinite situation here where we have no light at the end of the tunnel."

Though it denied Stephenson's request, the trial court granted the People's request and found extraordinary circumstances required placement outside Placer County, ordering Amador County be notified Stephenson might be placed there. But it emphasized it was not precluding eventual placement in Placer County.

*Senate Bill No. 1034*

Less than one month later, on January 1, 2023, statewide changes to conditional release procedures went into effect, pursuant to Senate Bill No. 1034 (2021-2022 Reg. Sess.) (Senate Bill 1034). Among other things, Senate Bill 1034 requires that a finding of "extraordinary circumstances" justifying placement in another county can occur only after, among other things, the county where the SVP lived prior to incarceration has demonstrated to the trial court that it "engaged in an exhaustive housing search with meaningful and robust participation from" the sheriff or the chief of police of the relevant locality, the county counsel, and the district attorney (or their designees). To facilitate this participation, the new law requires DSH to convene a committee that includes those local officials. (Stats. 2022, ch. 880, §§ 2, 3.)

Given these changes in the law, the trial court vacated its prior finding of extraordinary circumstances in an April 2023 ruling and ordered compliance with the

6

new requirements, noting (1) it could not say that local officials had previously engaged in the robust participation envisioned by the new law, and (2) the Sheriff and District Attorney of Amador County had submitted written opposition to Stephenson's placement in their county.

*May 2023 Report*

In a May 2023 report to the trial court, Liberty Health explained that since vacatur of the trial court's extraordinary circumstances finding, it had limited its ongoing property search to Placer County and there had been one Senate Bill 1034-compliant "housing committee" meeting. Liberty Health also detailed its concerns with a potential transient release for Stephenson, explaining such a placement would warrant the imposition of additional terms of conditional release to be endorsed by the court, including specific instructions on movement. A motel-based transiency had "certain inadequacies" because of shared walls, proximity to others, and interference with GPS signals. A motel-based transiency also required identification of multiple acceptable motels so that Stephenson could rotate between them in compliance with transient registration requirements and many motels in Placer County were noncompliant with statutory restrictions due to proximity to schools. Larger chain motels were unwilling to allow a registered sex offender to stay for extended periods of time. RV housing on a "fixed and legal property" was a "desirable option," but Liberty Health was unable to identify a specific area "zoned for this purpose." On-street housing in an RV required (1) coordination with county representatives to identify code-compliant parking locations that would not violate or undermine Stephenson's terms and conditions of conditional release, and (2) law enforcement's help in identifying two or three options for Stephenson to rotate between in compliance with transient registration requirements.

*July 2023 Hearing*

At the beginning of a July 2023 hearing, the trial court stated it knew Stephenson had recently filed a habeas corpus petition, but it had not seen the filing because a

different judge was assigned to the matter. Next, the trial court granted Liberty Health's request to stop paying rent for the property in Amador County that looked promising as a potential placement for Stephenson back in December 2022. The trial court then confirmed with the parties that it had to rule on Stephenson's new motion for transient release.

Counsel for Stephenson argued due process principles required release on transient status given the difficulty in finding a permanent placement, insisting Liberty Health could "come up with a plan where the community will be safe, Mr. Stephenson will be safe."

Liberty Health's assistant program director provided statistical data on the conditional release of SVPs, highlighting a higher rate of violations among those released on transient status. Out of 54 total releases in the program's history, eight were released under transient status. Of those, four (50 percent) had their release revoked and were rehospitalized due to serious violations. In comparison, the revocation rate for SVPs conditionally released to fixed residences was notably lower, at 30 percent. She also explained that transient releases come with stricter terms of conditional release, including prohibitions on traveling on specific roads and additional requirements for SVPs related to journaling and reporting to staff. She testified on cross-examination that there were no financial restrictions affecting the housing search.

The trial court confirmed that, with the exception of one, all SVP transients whose conditional releases had been revoked were residing in motels or hotels. The court then asked the assistant program director to discuss the possibility of an RV placement. She replied that Liberty Health would acquire an RV and, in collaboration with law enforcement, would rotate Stephenson between two or three locations.

When the trial court inquired about the recently mandated housing committee meetings, Liberty Health employees stated that DSH "has taken charge of that coordination." They noted that the prosecutor had not responded to a voicemail

8

regarding the feasibility of parking an RV on county land near the jail.  The prosecutor explained that he received the voicemail the afternoon before the previous business day and had not yet had the opportunity to consult with the sheriff or county counsel.  He also observed that since the county jail was within Roseville city limits, he would need to check with the Roseville City Attorney as well.

After the trial court expressed its disappointment with this apparent lack of coordination among members of Stephenson's housing committee, the prosecutor explained that, from their perspective, the main issue was DSH "shutting down" the normal meeting process due to concerns about compliance with notice and open-meeting rules under the Government Code.[5]  Regarding efforts to secure Stephenson's conditional release, the trial court asked the prosecutor, "How long is too long?"  The prosecutor responded, "[I]t's never too long if the alternative is an unsafe release," explaining that while "Stephenson has a constitutional right to a conditional release, . . . those conditions must be met, and the primary condition is that it must be safe."

The trial court inquired whether an RV placement would alleviate concerns associated with a transient release.  Liberty Health's assistant program director acknowledged that while an RV placement was not equivalent to a fixed residence, it was "more in line with a fixed placement" than a transient release to a motel or hotel.  The court further asked, "And then . . . there would be, of course, additional terms and conditions that the Court would have to approve probably for that kind of release.  That would also secure better supervision -- right? -- than what I have already signed."  The assistant program director confirmed, "Yes."

---

[5]  Specifically, the Bagley-Keene Open Meeting Act (Gov. Code, § 11120 et seq.) requires that, with certain exceptions, all meetings of a state body be open and public, because public agencies "may not decide what the public should know" (*Travis v. Board of Trustees of California State University* (2008) 161 Cal.App.4th 335, 341).

A representative from the Placer County Counsel's office explained that she had only recently learned about the proposal to place Stephenson in an RV on county property just before the hearing. She conveyed her understanding that the sheriff's office was unaware of any locations it would deem safe for both the public and Stephenson. In response, the trial court suggested that private mobile home parks might offer a potential solution. Liberty Health's assistant program director explained that mobile home parks "tend to be rather difficult because of the shared amenities and . . . how densely the RVs are located together." She continued: "We have been looking for private owners that have . . . RV pads. We do have an individual we have been in discussion with, but . . . there are certain rules that prevent an individual from living in an RV on residential land unless they're living on a property that's being currently rebuilt or being built. So that avenue, based on my research and research of my team, hasn't seemed as viable."

After further discussion, the trial court provisionally granted Stephenson's motion for conditional release as a transient, stating a preference for release to an RV rather than a motel. The court cautioned that the RV must be parked in Placer County locations approved by law enforcement. Additionally, the court emphasized the need for a future court date to add more terms and conditions to Stephenson's release to ensure public safety.

The parties and the trial court then discussed how to inform the public about Stephenson's transient release. In terms of the language of the notice, the prosecutor argued that an announcement stating Stephenson would be released in an RV within the community would likely satisfy the statutory requirements, "and then there may be public comment that would help to refine the locations." But the prosecutor added that "if we could narrow down the location before we release the notice, it might help narrow down the public comment, though, so that not everybody is responding." He later observed that "people in North Tahoe . . . as well as South Roseville" would receive notice "and obviously not both of those people will probably be impacted in any significant degree."

10

But he preferred to "err on the side of over-notifying." Stephenson's counsel said: "I don't know -- I can't comment whether notice is required or not. I would just say I don't want this issue to hold up Mr. Stephenson's release, . . . I believe the statute says notice to sheriff, police, district attorney, county agencies, so I don't know if it's necessarily going out to the entire public. I think all of those agencies are already aware that Mr. Stephenson is pending release. This will just be the notice that it's going to be transient status and they can comment on that."

The county counsel's representative inquired about how notice would be provided—by newspaper announcement or by letter? The trial court deferred to Liberty Health's assistant program director, who replied that DSH "follows the statute. So the district attorney's office and law enforcement are noticed, and then law enforcement and the district attorney's office decide how they choose to notice the community." After further discussion, the trial court stated that "for law enforcement purposes" it would direct notice be provided not only to the county sheriff but also to multiple city police departments within the county. Before concluding the hearing, the trial court offered Stephenson another opportunity to speak. "I have nothing more," Stephenson replied.

*September 2023 Report*

In a report filed with the trial court on September 1, 2023, Liberty Health indicated that it had identified two potential leads for a fixed residence for Stephenson following the July 2023 hearing: one location for parking an RV on private property and one single-family home. However, neither option appeared promising anymore. Liberty Health emphasized that, while it did not support transient release, it would continue its search for locations to park an RV in Placer County. The need for multiple locations arose from county ordinances that permitted " 'incidental camping' " for a maximum of 72 hours. As of the report's filing, the only plausible option Liberty Health could identify was to place Stephenson in an RV on the side of the highway in unincorporated areas of the county, requiring him to move every 72 hours.

11

Liberty Health "implore[d]" the trial court to consider the "many obstacles on many levels and from numerous sources" that transient placement would present. For example, there would be an increased risk to Stephenson's safety, as notifications of transient movements could make the SVP vulnerable to public harassment. Additionally, transient placements would result in greater contact with strangers compared to fixed residences.

*First September 2023 Hearing*

At the beginning of a September 2023 hearing, the trial court noted the courtroom was full and that the hearing was being live streamed to another courtroom. The court noted it had reviewed over 270 pages of letters attached to the prosecution's pleadings for the hearing, highlighting that these letters conveyed much "anger, fear, and frustration." The trial court emphasized to those present that before Stephenson's actual release, it would need to know specifics regarding location, supervision, and treatment. "And, of course, can public safety be maintained? Factoring into any decision will be input from the parties, from our justice partners, and from the public. So at the outset, it's unfortunate that there has been a lot of angst created over a decision when the actual release determination hasn't even been made yet."

Counsel for Stephenson argued that due process "requires us, as a society, to pay a price to figure out some plan where everything can be safe, but it still requires that [Stephenson] be released." "He's waited more than 18 months to be released." The prosecutor argued case law stood for the proposition that an SVP who has been "granted a conditional release still cannot be released until conditions are met such . . . that the release is safe."

The trial court heard from Placer County's Assistant Sheriff who stated the office's opposition to Stephenson's release in Placer County. Two county supervisors also addressed the court with their concerns.

12

At the end of the hearing, the trial court denied Stephenson's request for a "straight transient release." While acknowledging the importance of Stephenson's due process rights, the court emphasized the need to balance those rights against public safety. Expressing frustration, the trial court wondered aloud: "[H]ow long do you wait? A year and a half? Two years? Three years? Four years?" The court clarified that the existing order allowing Liberty Health to seek a location to park an RV, making it akin to a "fixed residence" would remain in effect. "That was the whole intent of that order. [¶] So I'm not going to vacate that order, or anything, but again, [Stephenson] doesn't get out until we can make sure that's going to be a safe circumstance, right? And so we're going to ensure that."

*Second September 2023 Hearing*

In a later September 2023 hearing, the trial court confirmed with the parties that parking on the side of the highway remained the only concrete option for an RV transient release. "[T]hat is not an appropriate alternative," the trial court said. "It's not a safe way to live, it would cause unrest, and it would be very difficult to supervise."

Stating its belief that the prosecution and county counsel were working in good faith to find a place for Stephenson, the trial court inquired about the other housing committee participants. "I'm mindful that a lack of diligence [by] the [c]ounty participants is something that I have to factor in . . . so I want to make sure we're all on track and still trying to find appropriate housing."

The trial court then stated there was "still good cause not to facilitate that transient release. There's safety concerns for Mr. Stephenson and the public. There's challenges and difficulty with supervision, especially the level of supervision required for his initial release. There's a low success rate for straight transient release. There's elevated risk factors with straight transient release. And I understand this is also our second time around for his conditional release. And the nature of the violation requires extra

13

caution." The trial court also emphasized the importance of allowing sufficient time for housing committee participants to assist in finding a suitable location for Stephenson.

*October 2023 Habeas Ruling*

In an October 2023 ruling, the judge presiding over Stephenson's SVP conditional release proceedings denied the habeas corpus petition for immediate release, which had originally been assigned to a different judge before that judge disqualified himself. In a 33-page ruling, the habeas court outlined the procedural background of the SVP case, including multiple hearings during which it presided and heard testimony. The court determined that an evidentiary hearing in the habeas matter was unnecessary and denied the petition.

The court found that Stephenson was not entitled to relief on his first claim, that he was denied equal protection of the law when he was compelled to testify in his original SVP civil commitment trial, for several reasons: (a) he did not provide the full trial transcript to the habeas court, making it impossible to fully assess the nature of his testimony and any potential prejudice; (b) he failed to present any argument regarding harmless error analysis, instead unpersuasively insisting that his compelled testimony was per se prejudicial; (c) he raised the claim after substantial delay and without good cause for the delay; (d) his assertion that counsel provided ineffective assistance by failing to raise the issue was unavailing; and (e) he failed to demonstrate that his compelled testimony resulted in a fundamentally unfair trial.

Stephenson's second claim—that his continued confinement violated due process principles and California statutes—was also without merit for several reasons: (a) the trial court had either explicitly or by inference found the statutorily required "good cause" to delay Stephenson's release due to the lack of an appropriate placement, (b) the delay in finding a suitable location was not due to lack of effort and was partly attributable to Senate Bill 1034's changes to SVP law and the challenges of convening committee meetings, (c) the trial court had to balance significant public safety concerns against the

14

prospect of an actual release, as Liberty Health and the prosecution presented a substantial record detailing the issues associated with a transient release, (d) Stephenson's prior failure on conditional release was a relevant consideration, and (e) Stephenson's contention of a systemic breakdown in the SVP conditional release process was unpersuasive. Thus, the delay in Stephenson's immediate release "is not unreasonable and does not violate due process."

The third claim, that delayed conditional release denied Stephenson's access to the courts to seek *unconditional* release, lacked merit because while the statutory scheme requires a minimum of one year on conditional release before an SVP may seek unconditional release, the notion he would ever qualify for unconditional release was too speculative.

Last, Stephenson claimed that law enforcement entities exceeded their statutory authority by posting information about his case on the Internet for the public to comment. This fourth claim lacked merit, the habeas court ruled, because statutes did not preclude sharing such information with the public. But the habeas court did caution local law enforcement entities not to "engage in behaviors . . . that undermine the ability to find a suitable place to release" Stephenson. If they did so, "such action can be considered in the due process analysis favoring" Stephenson's "immediate transient release," the habeas court observed.

*Habeas Corpus Petition in This Court*

In November 2023, Stephenson filed a pro. per. habeas corpus petition in this court, raising the same claims that the habeas court denied in October 2023. He seeks reversal of his commitment trial, an order for his immediate conditional release, immediate unconditional discharge, an evidentiary hearing if necessary, and/or any other relief we might deem appropriate. After considering the People's informal response to the petition and Stephenson's reply, in April 2024, we ordered the medical director of Coalinga State Hospital to show cause why the relief sought by Stephenson in his habeas

15

petition should not be granted. The People responded to the order to show cause, and Stephenson filed his traverse with the assistance of counsel in September 2024.

DISCUSSION

I

*Standard of Review*

A habeas corpus petitioner must establish by a preponderance of the evidence that the judgment restraining the petitioner's liberty is invalid and that there is a legal basis for relief. (*In re Sodersten* (2007) 146 Cal.App.4th 1163, 1223.)

Although this is an original habeas proceeding, it is not the first relevant habeas case. As explained above, the lower court previously considered and rejected the four claims that Stephenson raises here. While there was no evidentiary hearing in that habeas matter, the order denying Stephenson's habeas petition includes both explicit and implicit factual findings, as well as credibility determinations, based on the habeas judge's role as the trial court judge who heard evidence in the conditional release proceedings. Accordingly, the habeas court's factual determinations, while not binding, are entitled to great weight if supported by the record, especially regarding witness credibility. We independently evaluate the evidence and make our own factual determinations, while also conducting an independent review of the habeas court's resolution of legal issues and mixed questions of law and fact. (See *In re Sodersten*, *supra*, 146 Cal.App.4th at p. 1223.)

II

*Equal Protection*

Stephenson contends that when he was compelled to testify during the People's case-in-chief at his original commitment proceeding in 2009, he provided details of criminal conduct for which he was never charged. He further contends that, starting in 2015, case law evolved to establish that equal protection principles require the statutory right against compelled testimony in commitment proceedings, granted to criminal

16

defendants found not guilty by reason of insanity in California, to also be afforded to SVPs in commitment proceedings—absent a compelling state interest that is narrowly tailored.

The People do not dispute that Stephenson was compelled to testify in his original commitment proceeding. But they contend his equal protection claim is both procedurally barred as untimely and unpersuasive because any error was harmless. Stephenson insists in his traverse that the claim is timely, and the error was prejudicial.

We conclude Stephenson is not entitled to relief on this claim because the authority he invokes in support of it does not apply retroactively to his original civil commitment trial.[6]

A.    *Legal Background*

Our Supreme Court recently discussed retroactivity principles in *In re Milton* (2022) 13 Cal.5th 893, wherein it ruled that its 2017 decision in *People v. Gallardo* (2017) 4 Cal.5th 120—holding that a trial court violates a defendant's Sixth Amendment right to a jury trial if it makes factual findings about the nature of a defendant's prior conviction in imposing an enhanced sentence based on that prior conviction—did not apply retroactively to final judgments. (*In re Milton*, at p. 897.) Relevant here, our Supreme Court explained that California courts historically have applied two tests for

---

[6] The parties had the opportunity to brief this issue because whether a new rule of law applies retroactively is an issue that is always implicated when a party invokes the rule to attack a final judgment. (See *People v. Alice* (2007) 41 Cal.4th 668, 679 ["The parties need only have been given an opportunity to brief the issue decided by the court, and the fact that a party does not address an issue, mode of analysis, or authority that is raised or fairly included within the issues raised does not implicate the protections of [Government Code] section 68081"]; *People v. Graham* (2024) 102 Cal.App.5th 787, 798, fn. 6.)

retroactivity, a federal test, and a state test.[7] "Under both tests, a judicial decision that creates a 'new rule' is generally not given retroactive effect in cases on collateral review that were final when the rule was announced. [Citations.] Thus, the threshold question under both tests is whether a judicial decision constitutes a new rule. [Citation.] A new rule . . . will nevertheless be given retroactive effect under either test if it is substantive, as opposed to procedural." (*In re Milton*, at p. 904.) And under the state test, even a new *procedural* rule may be retroactive under a three-part test that considers the purpose to be served by the new procedural rule, the extent of law enforcement's reliance on the old rule, and how retroactive application might affect the administration of justice. (*Id.* at pp. 904-905.)

### 1. *Whether a Rule Is New*

Under the federal test, a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final. (*In re Milton*, *supra*, 13 Cal.5th at p. 905.) Under the state test, a rule is new where, among other things, a decision disapproves a "longstanding and widespread practice expressly approved by a near-unanimous body of lower-court authorities." (*Id*. at p. 906.)

### 2. *Substantive or Procedural*

Under both tests, a substantive rule alters the range of conduct or the class of persons that the law punishes, whereas a procedural rule regulates only the procedures for determining culpability. A new rule is not substantive just because it raises the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise. (*In re Milton*, *supra*, 13 Cal.5th at pp. 907-909.)

---

[7] The court declined in *Milton* to decide which test applied to the new procedural rule pronounced in *Gallardo*, because it "reach[ed] the same conclusion under both tests." (*In re Milton*, *supra*, 13 Cal.5th at p. 905.)

### 3. *Retroactivity of New Procedural Rules Under the State Test*

Under the state test for determining retroactivity of new procedural rules, the "first factor—the purpose of the new rule—is the critical factor." The other two factors come into play " 'only when the question of retroactivity is a close one after the purpose of the new rule is considered.' " (*In re Milton*, *supra*, 13 Cal.5th at p. 912.) If the first factor is determinative, the inquiry ends there. (*Id.* at p. 919.) A new procedural rule whose primary purpose is to overcome an aspect of the criminal trial that *substantially* impairs the truth-finding function and raises *serious* questions about the accuracy of guilty verdicts satisfies the first factor of the state test's retroactivity analysis. But if the legal regime in existence before the new rule already had multiple safeguards in place to ensure a "reasonably fair and reliable" decision, the new rule is not retroactive. (*Id.* at pp. 914-916.)

### B. *Analysis*

Assuming for the sake of argument that Stephenson is entitled to utilize retroactivity principles developed in the criminal context in his collateral attack of an underlying civil commitment,[8] we conclude the new rule he relies on is *not* retroactive. Therefore, his habeas claim that rests on the new rule is unavailing.

We agree with the parties that at the time of Stephenson's 2009 civil commitment trial *People v. Leonard* (2000) 78 Cal.App.4th 776 foreclosed any argument that he could refuse to testify in the People's case-in-chief. (See *Conservatorship of Eric B.* (2022) 12 Cal.5th 1085, 1098-1099 [citing *Leonard* for the proposition that California courts extended to the SVP commitment context the United States Supreme Court's holding that

---

[8] Also compare *Conservatorship of K.W.* (2017) 13 Cal.App.5th 1274, 1284 ("reasoned policy argument can be made" that new case law regarding the admissibility of evidence in criminal trials should not be retroactive in the civil context; but "absent a different policy articulation by the Supreme Court," the court assumed new case law is retroactive "in any context where liberty interests are at stake").

the constitutional right against compelled testimony does not apply in commitment proceedings that arise in connection with criminal charges].)

Thus, in relation to the 2009 civil commitment proceeding, today's rule—that a person the People seek to commit as an SVP cannot be compelled to testify in the People's case-in-chief, absent a compelling state interest that is narrowly tailored—is "new" under both the federal and state tests. It is new under the federal test because it was not dictated by precedent existing at the time Stephenson was committed. (*In re Milton*, *supra*, 13 Cal.5th at p. 905.) It is also new under the state test because it disapproved longstanding intermediate appellate court authority where no split of opinion existed. (*Id*. at p. 906.)

Because it does not alter the range of conduct or the class of persons that can be civilly committed as an SVP, the new rule is not substantive. It is a procedural rule that regulates what evidence the People may introduce in the effort to prove that someone should be committed as an SVP. (See *In re Milton*, *supra*, 13 Cal.5th at pp. 907-909.) Thus, under the federal test, the new procedural rule is not retroactive.

But as explained above, a new procedural rule may be retroactive under the state test if its primary purpose is to overcome an aspect of trial that substantially impairs the truth-finding function. (*In re Milton*, *supra*, 13 Cal.5th at pp. 914-916.) The new procedural rule at issue here does not have such a primary purpose. The right to remain silent in one's own trial does not promote the search for truth but frustrates it. (See *United States v. Nixon* (1974) 418 U.S. 683, 709-710 [explaining that the Fifth Amendment right not to be compelled in a criminal case to be a witness against oneself, like the attorney-client and priest-penitent evidentiary privileges, is intended to protect "weighty and legitimate . . . interests," but remains an exception to the general rule that the public has a right to every person's evidence and is therefore "in derogation of the

search for truth"].)  Thus, under the state test, the new procedural rule is not retroactive. Accordingly, Stephenson's equal protection claim is unavailing.**9**

III

*Continued Confinement*

Stephenson contends that continued confinement long after the trial court granted his petition for conditional release violates both the SVPA's statutory scheme and due process principles.  The People disagree, arguing that under the statutory scheme, it is the trial court's approval of a *final* placement plan that triggers an SVP's right to a timely release, not the trial court's order granting a petition for conditional release.  We agree with the People.

A.    *Legal Background*

    1.    *The Statutory Scheme*

The SVPA contemplates involuntary commitment of SVPs, people who have been convicted of at least one enumerated sexually violent offense and who have a diagnosed mental disorder that makes it likely they will engage in sexually violent and predatory criminal behavior if released.  The SVPA was not designed to be punitive.  A person is confined only so long as they pose a threat to the public.  A person can only be civilly committed if, after a trial, a judge or a unanimous jury finds beyond a reasonable doubt that the person is an SVP, and only then does the court order an SVP indefinitely committed to DSH for appropriate treatment and confinement in a secure facility. (*People v. Ingram* (2024) 104 Cal.App.5th 1242, 1247-1248.)

SVPs are evaluated annually for an assessment (1) whether they still meet the SVP definition, and if they no longer do, whether they should be considered for *unconditional*

---

**9** Given this conclusion, we deny as moot Stephenson's November 20, 2024, motion requesting that we take judicial notice of the entire transcript from his civil commitment trial in order to demonstrate prejudicial error.

21

discharge, and (2) whether they are suitable for *conditional* release to a less restrictive alternative. An SVP "is suitable for conditional release to a less restrictive alternative (typically, placement in the community rather than the secure facility where he or she has been housed as an SVP) if he or she is no longer 'a danger to the health and safety of others' because it is not 'likely that he or she will engage in sexually violent criminal behavior due to his or her diagnosed mental disorder if under the supervision and treatment in the community.' (§ 6608, subd. (g); see also § 6607, subd. (a); *People v. McCloud* (2021) 63 Cal.App.5th 1, 9-10.)" (*People v. Peyton* (2022) 81 Cal.App.5th 784, 796-797 (*Peyton*).)

By contrast, an SVP is entitled to unconditional discharge if he or she " 'no longer meets the [SVP] definition' because the SVP's 'diagnosed mental disorder has so changed that he or she is not a danger to the health and safety of others and is not likely to engage in sexually violent criminal behavior if discharged.' (§§ 6604.9, subd. (d), 6605, subd. (a)(2).)" (*Peyton*, *supra*, 81 Cal.App.5th at p. 798.)

If certain threshold procedural requirements are met (see, e.g., § 6608, subd. (f)), the trial court must hold a hearing to determine whether an SVP may be conditionally released. If the trial court determines an SVP is suitable for conditional release, it "shall order the [SVP] placed with an appropriate forensic conditional release program operated by the state for one year." (§ 6608, subd. (g).)

But *before* the trial court places an SVP "in a state-operated forensic conditional release program, the community program director designated by [DSH] shall submit a written recommendation to the court stating which forensic conditional release program is most appropriate for supervising and treating the committed person. If the court does not accept the community program director's recommendation, the court shall specify the reason or reasons for its order on the record." (§ 6608, subd. (h).)

Once the trial court "determines that the [SVP] should be transferred to a state-operated forensic conditional release program, the community program director, or their

22

designee, shall make the necessary placement arrangements and, within 30 days after receiving notice of the court's finding, the person shall be placed in the community in accordance with the treatment and supervision plan unless good cause for not doing so is presented to the court."  (§ 6608, subd. (i).)

### 2.    *Due Process*

Once a court determines that a particular SVP is suitable for conditional release, "that person unquestionably has a significant liberty interest in being released."  (*People v. Superior Court* (*Karsai*) (2013) 213 Cal.App.4th 774, 788-789.)  "To avoid . . . a potential due process problem," a different panel of this court in *Karsai* ruled that the SVPA does not preclude a transient release: "under the statutory scheme the securing of a specific residence is not a prerequisite to a finding that the person would pose no danger to others if under outpatient supervision and treatment."  (*Id.* at p. 789.)

### B.    *Analysis*

Stephenson contends section 6608, subdivision (i)'s 30-day language makes his release mandatory as both a statutory and due process matter, absent a showing of good cause.  We agree with the People that he is incorrect.  The overall statutory scheme of the SVPA makes clear that the "finding" referenced in section 6608, subdivision (i) that starts a 30-day clock is the trial court's approval of a final placement plan.[10]

Section 6608, subdivision (g) provides the trial court must order a suitable SVP "placed with an *appropriate* forensic conditional release program."  (Italics added.)  Section 6608, subdivision (h) provides that *before* the trial court places an SVP in a conditional release program, it must accept or reject the recommendation of the community program director designated by DSH regarding "which forensic conditional

---

[10]  Because the statutory language construed in light of the overall statutory scheme is clear, we need not refer to the legislative history.  (See *Gunther v. Alaska Airlines, Inc.* (2021) 72 Cal.App.5th 334, 353-354; *Lopez v. Martinez* (2000) 85 Cal.App.4th 279, 285.)

release program is *most appropriate* for supervising and treating" the SVP. (Italics added.) Given that context, the relevant "finding" contemplated in section 6608, subdivision (i) ("within 30 days after . . . the court's finding, the [SVP] shall be placed in the community in accordance with the treatment and supervision plan," absent good cause) is the trial court's determination of an *appropriate* conditional release placement plan, with terms and conditions that satisfy public safety concerns. (See § 6608, subd. (g) [an SVP is no longer a danger to the health and safety of others when it is not likely that he or she will engage in sexually violent criminal behavior due to his or her diagnosed mental disorder *if under the supervision and treatment in the community* (italics added)].)

This interpretation of the SVPA's conditional release provisions satisfies due process principles, because, (1) when Stephenson was originally committed, the state proved that Stephenson had a diagnosed mental disorder that made it likely he would engage in sexually violent and predatory criminal behavior if released and (2) the state continues to conduct annual reviews of his suitability for *unconditional* release. (*Peyton*, *supra*, 81 Cal.App.5th at pp. 803, 808 [rejecting an SVP's procedural due process challenge, in part because DSH is "obligated to file a petition for habeas corpus relief" seeking unconditional discharge if it "develops 'reason to believe' that an SVP *at any time* no longer qualifies as an SVP"].) Though the trial court granted his petition for conditional release, Stephenson remains an SVP.

*Karsai* concerned a trial court's *discretion* to order a transient release. Contrary to Stephenson's intimations, the case does not stand for the proposition that an SVP has a categorical right to transient release once a petition for conditional discharge has been granted. Rather, transient release is inappropriate if, as here, the trial court is not satisfied it can be accomplished in a manner consistent with public safety. (See *People v. Superior Court* (*Karsai*), *supra*, 213 Cal.App.4th at p. 789 & fn. 8 [the question whether the trial court abused its discretion in making the transient-release order was not before the court]; *People v. Superior Court* (*Quarles*) 2020 45 Cal.App.5th 637, 651-654

24

[vacating the trial court's order of conditional release under § 6608 because it apparently "applied the incorrect legal standard by looking for the least restrictive setting in which to place [the SVP] without due consideration for public safety"]; *Peyton*, *supra*, 81 Cal.App.5th at p. 795 [the " 'primary' objective" of the SVPA is to protect the public; a secondary objective is to treat SVPs' mental disorders].)

The habeas court ruled that the delay in Stephenson's release was "not unreasonable and does not violate due process" after finding the delay was "through no lack of effort" and there were significant public safety concerns militating against Stephenson's transient release in Placer County. We agree.

Stephenson contends our interpretation of the conditional release scheme would grant the community program director open-ended authority, allowing them to effectively nullify a conditional release order by refusing to submit a treatment and supervision plan. This is not the case. SVPs have the right to presume that the community program director designated by DSH will fulfill their duty under the SVPA by regularly submitting a written recommendation for the most appropriate forensic conditional release program. (See *T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 184 [every person has a right to presume that every other person will perform his duty and obey the law]; Evid. Code, § 664 ["It is presumed that official duty has been regularly performed"].) There is no reason to depart from that presumption here. Accordingly, Stephenson's "continued confinement" claim is unavailing.[11]

---

[11] In connection with this claim, Stephenson appears to request an evidentiary hearing to develop a record regarding his allegation that there has been a "systemic breakdown" in the application of section 6608, subdivision (i). Because, as explained above, Stephenson is entitled to annual reviews to determine whether he remains an SVP, it is unclear what relief he would be entitled to in the scenario of the breakdown he alleges. Accordingly, we deny the request for an evidentiary hearing. (Cf. *People v. Duvall* (1995) 9 Cal.4th 464, 475 [issuance of an order to show cause "indicates the issuing court's *preliminary*

IV

*Access to the Courts*

Stephenson contends his constitutional right of access to the courts is being violated because, had he been released within 30 days of the trial court's January 2022 order granting his petition for conditional release, he would have been eligible to seek a court order of unconditional discharge under section 6605 by February 2023.[12]  He seeks immediate unconditional discharge as a remedy for the alleged constitutional violation.

First, as explained above, we disagree with the premise that Stephenson had a categorical right to actual release under section 6608, subdivision (i) when the trial court had serious and unresolved public safety concerns.

Second, we agree with the habeas court that this claim is too speculative.  Because the constitutional right of access to the courts is ancillary to an underlying colorable claim, someone alleging a violation of this right must show an arguable underlying claim was lost by the ostensible restriction on their access to the courts.  (See *Christopher v. Harbury* (2002) 536 U.S. 403, 414-415.)  Stephenson has not made that showing here.  It is uncertain whether, after being unsuccessful in his initial attempt at conditional release,

---

*assessment* that the petitioner would be entitled to relief if his factual allegations are proved"].)

[12]  If DSH's annual evaluation "indicates that the SVP is *not* suitable for unconditional discharge, then the SVP has a two-step path to unconditional discharge—namely, (1) he or she must file a petition for conditional release under section 6608 (§ 6608, subd. (a)); and (2) *after one year* on conditional release, he or she may file a petition for unconditional discharge under section 6605 (§ 6608, subd. (m))." (*Peyton*, *supra*, 81 Cal.App.5th at p. 799, second italics added.)  The " 'process of determining whether [an SVP] is prepared for successful,' unconditional discharge 'into the community is unquestionably fraught with uncertainty.' [Citation.]  The one-year period of conditional release . . . is valuable because it mitigates that risk—and thereby 'protects the public'— 'by requiring SVPs [to] demonstrate the ability to spend a year in the community' without revocation of that status." (*Id*. at p. 806.)

Stephenson can demonstrate the ability to spend a full year in the community without revocation.

V

*Conditional Release Notifications*

Stephenson's last claim is that law enforcement agencies "weaponized" SVPA notification procedures in excess of their authority by "notify[ing] the media, and consequently the public at large of [his] impending release," and by soliciting the general public's resistance to that release in Facebook postings, effectively engaging in "hate speech" against him. The People neither admit nor deny this claim, but contend Stephenson is not entitled to either conditional release or unconditional release on this basis. In his traverse, Stephenson states only that he is not seeking an injunction to prevent law enforcement agencies from exceeding the scope of SVPA's notification procedures but observes that he "could possibly have grounds to seek an injunction to prevent future transgressions."

We reject this claim on two distinct grounds. First, the argument that it was inappropriate to notify the general public about his possible transient release is forfeited because Stephenson did not raise this concern when the question arose at the July 2023 hearing in the trial court.[13]

As described above, when the prosecutor observed that numerous people in disparate parts of Placer County would receive notice of Stephenson's possible transient release and that he preferred to "err on the side of over-notifying," Stephenson's counsel

---

[13] The parties had the opportunity to brief forfeiture, an issue always implicated when a party raises a claim on habeas that could have been raised first in the trial court. (See *People v. Alice*, *supra*, 41 Cal.4th at p. 679; *In re Seaton* (2004) 34 Cal.4th 193, 200 ["just as a defendant generally may not raise on appeal a claim not raised at trial [citation], a defendant should not be allowed to raise on *habeas corpus* an issue that could have been presented at trial"].)

27

responded that he could not comment "whether notice is required or not," but did not want the question of the scope of notice to delay transient release. "*I don't know if it's necessarily going out to the entire public*," counsel said. When someone asked how notice would occur, the trial court deferred to Liberty Health's assistant program director, who replied that DSH "follows the statute. So the district attorney's office and law enforcement are noticed, *and then law enforcement and the district attorney's office decide how they choose to notice the community*." (Italics added.) Before ending the hearing, the trial court gave Stephenson another opportunity to speak. "I have nothing more," Stephenson said.

Second, it appears our ruling on this claim would result in an advisory opinion, something we decline to provide. (See *O'Brien v. Superior Court* (1976) 61 Cal.App.3d 62, 72 [declining to "give an advisory opinion" on an issue, because disposition of the matter at bench did not require resolution of the issue].)

DISPOSITION

The habeas petition is denied.

      /s/<br>
BOULWARE EURIE, J.

We concur:


    /s/<br>
HULL, Acting P. J.


    /s/<br>
MAURO, J.

28

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| In re WILLIAM STEPHENSON on Habeas Corpus. | C099785<br><br>(Super. Ct. Nos. SCV0037867, WHC001813) |

ORIGINAL PROCEEDING. Petition for writ of habeas corpus. Petition denied. Garen J. Horst, Judge.

John L. Staley, under appointment by the Court of Appeal, for Petitioner.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Julie A. Hokans, Deputy Attorneys General, for Respondent the People.

Rob Bonta, Attorney General, Cheryl L. Feiner, Assistant Attorney General, Gregory D. Brown and Jessica C. Butterick, Deputy Attorneys General, for Respondent State Department of State Hospitals.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II, IV, and V of the Discussion.

The opinion in the above-entitled matter filed on December 23, 2024, was not certified for publication in the Official Reports.  For good cause it now appears the opinion should be published in the Official Reports, and it is so ordered.


FOR THE COURT:


_____/s/_____
HULL, Acting P. J.


_____/s/_____
MAURO, J.


_____/s/_____
BOULWARE EURIE, J.